IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
NO. _____

| | |
|---|---|
| **AMANDA E. COLEMAN** <br><br> PLAINTIFF, <br><br> vs. <br><br> **ARNOLD GLENN STULTZ** <br><br> DEFENDANT. | **COMPLAINT** <br> (in Admiralty) |

Plaintiff, Amanda E. Coleman, in a cause civil and maritime against the Defendant Arnold Glenn Stultz alleges and says:

1. This Court has original jurisdiction over this action pursuant to Title 28 U.S.C. § 1333(1), in that this is a claim in admiralty based upon Defendants' maritime negligence occurring upon navigable waters of the Atlantic Ocean off of Hatteras, North Carolina, during a traditional maritime activity and within the Court's maritime jurisdiction. This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. Jurisdiction is also proper upon diversity of citizenship pursuant to Title 28 U.S.C. § 1332 and this Court's supplemental jurisdiction pursuant to Title 28 U.S.C. § 1367(a). The parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

3. Venue is proper in this District pursuant to Title 28 U.S.C. § 1391(b)(2) and (3).

1

4. Plaintiff, Amanda E. Coleman, is a resident of Isle of Wight County in the Commonwealth of Virginia.

5. Upon information and belief, Defendant, Arnold Glenn Stultz, is a citizen and resident of the State of North Carolina and was the owner and operator of the *TWISTED TUNA,* a 47' recreational uninspected passenger vessel, U.S.C.G. Doc. No. 926233 on June 25, 2017.

6. On or about June 25, 2017, at approximately 5:50 a.m., Plaintiff, Amanda E. Coleman, and her husband and three children arrived for an all-day fishing charter aboard the *TWISTED TUNA* which was scheduled to go to the Gulf Stream, approximately 10 to 15 miles offshore. The Plaintiff and her family had scheduled the charter with the *TWISTED TUNA* and paid a fee for the offshore fishing charter.

7. At the time of their arrival, one mate, Dale Trajer, was preparing the vessel for the charter. Thereafter, at approximately 6:05 a.m., Captain Arnold Glenn Stultz arrived and boarded the vessel. The charter departed Hatteras Landing Marina at approximately 6:15 a.m. from the *TWISTED TUNA* dock and proceeded through the Hatteras Inlet to its offshore destination.

8. When Plaintiff and her family came aboard the *TWISTED TUNA*, Captain Arnold Glenn Stultz was in charge of the vessel and the charter. No passenger orientation, safety briefing, introductory comments or safety warnings whatsoever were provided to Plaintiff and her family by either Captain Schultz or the mate prior to the commencement of the Charter. Plaintiff and her family had been on a charter before June 25, 2017 but did not have extensive boating experience.

9. Shortly after boarding the *TWISTED TUNA*, Captain Arnold Glenn Stultz, indicated to the Plaintiff and her family that "It is going to be a bit sporty out there today." The weather was windy and the seas were rough and choppy. The sky was overcast at departure and intermittent rain occurred on the way out of the inlet and throughout the day.

10. While crossing the Hatteras Inlet, waves went breaking over the fly bridge of the *Twisted Tuna* due to the rough waves. Captain Shultz asked the Plaintiff's husband to close the isinglass windows on the fly bridge so that water would not go into the cabin. Plaintiff and her husband thought that it was unusual for a 47' boat to take water over the bow.

11. The *Twisted Tuna* arrived at its destination, the Gulf Stream, approximately 45 minutes after departure from the dock. Fishing lines were thrown out and Plaintiff and her family fished for approximately 1 – 1 ½ hours.

12. At approximately 9 to 9:30 o'clock a.m., Plaintiff was on deck and her husband and two children were in the cabin of the vessel. The fish were not biting and the husband and two children were relaxing and taking a break. Plaintiff was on deck immediately outside of the cabin and Captain Schultz was at the helm operating the vessel. The vessel was trolling at approximately 5 to 7 knots.

13. The mate had gone into the cabin several minutes prior to the Plaintiff's husband and two of their children going in to the cabin to get some tackle or for some other purpose. The mate had opened the cabin door, which was a sliding door but did not lock or hook the cabin door to secure it in the open position. The Plaintiff was helping her middle son into the cabin when the boat suddenly and violently rocked. Plaintiff was in the center, left of the doorway. To hold on, she placed her right hand on the doorway jamb at approximately 4' from the deck. The door slid violently and instantly crushed her right hand and wrist. She was unable to remove her right hand from the door frame as she was using it for support due to the boat rocking and the speed of the door as it was closing.

14. Plaintiff's right hand was bleeding and obviously injured after being crushed by the cabin door. Her husband assisted her into the cabin, seated her on the couch and brought paper towels to place on her bleeding hand.

15. Immediately after Plaintiff suffered the injury to her hand, the mate called for the family to come out of the cabin as the fish were striking. Plaintiff's husband advised the mate that Plaintiff was hurt and had injured her right hand and wrist when it was crushed by the sudden and violent closing of the cabin door. Plaintiff had to hold onto the cabin door in order to avoid being thrown around in the vessel due to the rough seas and in order to assist her young son into the cabin.

16. For the next ten minutes or so, all parties aboard the vessel except the Plaintiff were occupied with handling the fishing lines. After the lines were in, Plaintiff's husband and the mate examined the cabin door. The mate, Dale Trajer, advised the Plaintiff's husband that he did not know how to secure the cabin door. After examination of the door, Plaintiff's husband figured out how to secure the cabin door without the assistance of the mate.

17. Captain Schultz did not go into the cabin and look at the Plaintiff's injured hand and wrist but did inquire of the husband how she was and if she needed immediate medical attention. Plaintiff's husband discussed the matter with her and they decided that they did not believe anything of a medical nature could be accomplished by shortening the charter (for which they had paid the sum of $1,500.00) by returning to the dock at that time. Plaintiff stayed in the cabin for the remainder of the trip with ice applied to her hand and wrist which was supported and wrapped in an effort to relieve the pain and swelling.

18. The mate had looked at the Plaintiff's injured hand and wrist on one occasion shortly after the injury but did not ask how she was doing or look at the injuries again.

19.     At approximately 3 o'clock p.m., the *Twisted Tuna* began its return voyage to Hatteras Inlet.  Upon return to the dock, Captain Schultz inquired as to the condition of the Plaintiff's hand.  Neither the Captain nor the mate assisted the Plaintiff and her family with cleaning of the fish they had caught.

20.     Plaintiff and her family departed the dock and returned to the campground where they were staying at approximately 5:30 to 6 o'clock p.m., changed clothes and drove to Outer Banks Hospital ER to seek medical assistance for the injuries to Plaintiff's right hand and wrist. At the hospital, contusion of right hand was noted.  X-rays were taken and no broken bones were identified.  A splint was applied to Plaintiff's hand and wrist and pain medication was prescribed. Plaintiff and her family left the hospital and arrived back at the campground at approximately 1 o'clock a.m.  Plaintiff left the campground early in the morning of June 26, 2017 and returned to her home in Windsor, Virginia.

21.     On 7/4/17, Plaintiff went to Bayview Phyician Services in Suffolk, VA for hand pain status post crush injury.  A thumb spica brace was prescribed. Because of increased pain, Plaintiff saw Dr. Tommy Osborne, an orthopedic surgeon, on July 12, 2017. A hard hand cast was applied to her hand.  On 7/19/17, Dr. Osborne removed the hard cast and applied a splint.  On 8/2/17, Plaintiff was seen by Dr. Osborne for a follow-up visit for right dorsal wrist pain.

22.     After an 8/4/17 MRI of the right wrist showing a partial tear of the dorsal intercarpel ligament, Dr. Osborne referred Plaintiff to Dr. Nicolai Baecher, an orthopedic hand injury specialist at the Sports Medicine and Orthopaedic Center in Sulfolk, VA.  Dr. Baecher saw Plaintiff on 8/28/17, for pain in the right wrist and ligament tear or TFCC injury (injury to the fibrocartilage complex, found in the wrist, between the end of the ulna bone and the carpals and is the main stabilizing component of the wrist).

23. MRI diagnostic procedures performed on September 8, 2017, showed mild separation of the scaphoid and lunate bones in the wrist and a partial tear of the scapholunate ligament. Throughout the Fall of 2017, Plaintiff, continuing to suffer wrist pain, had follow-up visits with Dr. Baecher and received occupational therapy 2 to 3 times per week from 9/18/17 to 11/29/17.

24. An MRI without contrast on 12/15/17 for crushing injury and right wrist pain showed (1) tearing of the central TFCC, (2) probable tearing of the ulnar fovea attachments of the peripheral TFCC, (3) and a intact scapholunate ligament, and (4) mild synovitis. A RF Arthogram for wrist injury showed findings suggestive of a TFCC injury (triangular fibrocartilage complex tear).

25. Dr. Baecher performed surgery on Plaintiff's right wrist on 1/5/18 at Obici Hospital in Suffolk. Dr. Baecher reported that the TFCC repair was one of the largest he has had to repair. On one side, he had to scrape and clean out the damaged cartilage. On the other side over 60% of the TFCC was torn and Dr. Baecher had to suture it on the inside and the outside. Plaintiff was out of work for two weeks due to the surgery.

26. At a January 11, 2018, follow-up visit, a short arm cast was applied to Plaintiff's right wrist. The 2/19/18 post-operative follow-up shows that the follow-up was for a right distal radius fracture.

27. On January 18, 2018, the external stitches were removed and a hand cast was applied. On February 19, 2018, the cast was removed. Therapy was prescribed for 2 times per week until an appointment scheduled for review on 3/29/18 with Dr. Baecher. On 3/21/18 at a scheduled therapy session Plaintiff reported that therapy was painful, and pursuant thereto, the

therapist discontinued further therapy until the 3/29/18 return appointment with Dr. Baecher. On 3/29/18, Dr. Baecher ordered that continued therapy should be discontinued and secondary osteoarthritis was added to the diagnosis.

28.     On June 27, 2017, Plaintiff returned to work at Griffey Eye Care in Chesapeake, Virginia. She was unable to use her right hand, which was still in a splint, in the performance of her duties and relied upon and received assistance from other employees in the office in order to perform her duties. Plaintiff worked full-time until approximately July 18, 2017 with the assistance of other personnel in the office. After July 18, 2017, Plaintiff worked on a part-time basis of approximately 20 to 25 hours weekly until the end of March 2018, at which time she voluntarily terminated her position with Dr. Griffey due to her inability to perform required basic duties. Plaintiff was also out of work for two weeks in January 2018 due to the surgery.

29.     Plaintiff's inability to perform her required duties as a licensed optician were the result of her loss of fine motor skills in her right hand due to the injuries suffered by her on June 25, 2017. She did not have the strength or stability in her right hand and wrist necessary to perform her duties. Currently, she cannot hold more than a ½ pound weight in her right hand, and sudden movement can cause intense acute pain.

30.     Plaintiff has suffered and continues to suffer great physical pain in her right hand and wrist which required her to undergo extensive and painful medical evaluations, treatments and surgery. She has been rendered unable to go on about her usual work, family and recreational activities and has been deprived of the quality of life that she enjoyed prior to sustaining the injuries to her right hand and wrist on June 25, 2017 while onboard the *TWISTED TUNA* as described herein.

7

Case 2:18-cv-00028-FL   Document 1   Filed 06/25/18   Page 7 of 11

31. At the time that Plaintiff suffered the injuries to her right hand and wrist while onboard the *TWISTED TUNA*, Plaintiff was employed as a licensed optician, ABO certified, and was employed at Griffey Eye Care in Chesapeake, Virginia. Her duties consisted of, but were not limited to, the following: Assisting patients with pre-authorization of medical benefits through their vision or medical insurance; data entry; billing and coding; patient check-out; filing medical claims for patients; ordering contact lenses and product supplies; checking in materials; selling and ordering glasses including all measurements as well as adjustments required for proper fitting; precise segment height measurements taken by hand measurements by optician by hand; lensometer and prescription verifications; returns and warranties on frames; providing training for new contact lens wearers and the proper care of the products prescribed.

32. Plaintiff's education consists of graduation from Tidewater Community College, Chesapeake, Virginia, in 2003; Norfolk Vocational Center/Virginia Apprenticeship Program for Licensed Opticians in June 2017. She is certified with the American Board of Opticianry and is licensed through the Virginia Board of Licensing for opticians, License Number 1101004251.

33. Plaintiff has incurred medical bills in excess of the amount of $30,000.00 and will incur future medical bills for medical treatment as well as the pain she now suffers due to the injuries sustained by her while onboard the *TWISTED TUNA*, and due to the negligence of the Defendants on June 25, 2017.

34. At no time did Defendant, as operator of the vessel, ever warn Plaintiff, a passenger and relative newcomer to boating in the open ocean, about the potential dangers of the cabin door, particularly in light of the danger associated with the unsecured cabin door. Had defendant fulfilled his duty in securing the unlocked cabin door in a locked position, the Plaintiff would likely not have suffered the crushing injury to her right hand and wrist.

35. Defendant, Captain Arnold Glenn Schultz, owed Plaintiff, as his paying charter passenger, the duty to exercise reasonable care under the circumstances to avoid her being injured and he negligently breached this duty. In particular, Defendant Arnold Glenn Schultz negligently breached his non-delegable duty by his failure to:

    (a) provide Plaintiff with vessel orientation and safety briefing and safety warnings relating to this particular maritime charter;

    (b) properly equip and man the vessel;

    (c) provide a trained and well-qualified crew;

    (d) properly secure the cabin door after it was opened by the mate;

    (e) provide instructions to the mate and passengers as to securing the cabin door in a locked position;

    (f) warn the Plaintiff that the door to the cabin was not properly secured;

    (g) maintain a proper lookout and operate the vessel at a safe speed in light of the weather and sea conditions then and there existing; and

    (h) follow the rules of good seamanship.

36. As a proximate result of the negligence of the Defendant, Arnold Glenn Schultz, Plaintiff suffered the injuries, pain and suffering, losses and incurred medical expenses herein alleged, past, present and future.

37. The Plaintiff's injuries, resulting disabling effects, continuing pain and inability to work in her profession as a licensed optician, is likely to continue for the remainder of her life. Her injuries have interfered with her ability to engage as before in her daily life as a wife and mother of three minor children. She has suffered a substantial loss of wages and likely will suffer

9

Case 2:18-cv-00028-FL    Document 1    Filed 06/25/18    Page 9 of 11

an ongoing loss of wages due to her injuries. The injuries have caused Plaintiff physical pain and suffering and loss of enjoyment of life.

38. Plaintiff's injuries are permanent and she will continue to suffer physical pain and has likely suffered a permanent diminution in her earning capacity. Plaintiff was 34 years of age at the time of her injuries (date of birth October 18, 1983), in excellent health, and had a statutory life expectancy of approximately 43.8 years (N.C.G.S. §8-46).

39. Plaintiff is entitled to recover compensatory damages for past, present, and future medical expenses, pain and suffering, and loss of wages.

WHEREFORE, Plaintiff prays:

1. That process issue in due form of law against the Defendant, according to the practice of this Honorable Court, citing them to appear and answer under oath all and singular the matters aforesaid;

2. That Plaintiff have and recover of the Defendants compensatory damages in the sum of at least $1,500,000.00, including, but not limited to, compensation for bodily injuries, permanent injuries, pain and suffering, medical expenses, loss of earnings and loss of future earnings capacity, together with pre-judgment interest from the date of the filing of this Complaint and post-judgment interest upon the award and judgment entered herein until paid;

3. That the costs of this action be taxed against the Defendant; and

4. For such other and further relief as to the Court may seem just and proper.

[continued on next page]

This 25th day of June, 2018.

          **ZAYTOUN LAW FIRM, PLLC**

          /s/ Matthew D. Ballew
          Matthew D. Ballew
          N.C. State Bar No.: 39515
          mballew@zaytounlaw.com
          Robert E. Zaytoun
          N.C. State Bar No.: 6942
          rzaytoun@zaytounlaw.com
          John R. Taylor
          N.C. State Bar No. 43248
          jtaylor@zaytounlaw.com
          3130 Fairhill Drive, Suite 100
          Raleigh, NC 27612
          Telephone: (919) 832-6690
          Facsimile: (919) 831-4793


          CHARLES K. McCOTTER, JR.
          Of Counsel Zaytoun Law Firm, PLLC

          /s/ Charles K. McCotter, Jr.
          Charles K. McCotter, Jr.
          N.C. State Bar No.: 5018
          ckm@ckmccotterlaw.com
          2859 Trent Rd.
          PO Box 12800
          New Bern, NC 28561-2800
          Telephone: (252) 635-1005
          Facsimile: (252) 631-5037